## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| RYZE RENEWABLES II, LLC, *et al.*,[1] | Case No. 23-10289 (___) |
| Debtors. | (Joint Administration Requested) |

### DECLARATION OF KLAUS GERBER IN SUPPORT OF
### CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Klaus Gerber, pursuant to 28 U.S.C. § 1746, and under penalty of perjury, declare the following to the best of my knowledge, information, and belief:

1. I am the Chief Restructuring Officer ("CRO") of Ryze Renewables II, LLC ("Ryze II") and Ryze Renewables Las Vegas, LLC ("Ryze Las Vegas" and, together with Ryze II, the "Debtors" or the "Company") and a Managing Director with Alvarez & Marsal Europe, LLP in London. I have more than fifteen years of financial and operational experience spanning a wide range of industries, including construction, consumer products, logistics, manufacturing, commodity chemicals, and others. I specialize in assisting distressed and underperforming companies and, in connection therewith, have served in various roles, including interim chief restructuring officer, chief financial officer, administrator, and liquidating agent. I earned a degree in business from the University of Nuremberg, Germany and an MBA from the University of Georgia.

2. Alvarez & Marsal North America, LLC ("A&M") began advising the Debtors on August 11, 2022 as their financial advisor. On September 19, 2022, A&M's

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their respective federal tax identification numbers, are: Ryze Renewables II, LLC (8411) and Ryze Renewables Las Vegas, LLC (8352). The Debtors' address is 5233 E El Campo Grande Ave, Las Vegas, NV 89115.

engagement was modified to provide for my appointment as CRO and for A&M's provision of additional support staff.

3. All facts set forth in this declaration (this "Declaration") are based on: (i) my personal knowledge; (ii) my communications with members of the Debtors' Boards of Managers (collectively, the "Boards"), the Debtors' consultants and applicable professional advisors, and the current and former employees and contractors of certain non-Debtor affiliates; (iii) my opinions developed through my overall professional experience and my personal knowledge of the Debtors' history, financial condition, and business operations and affairs; or (iv) my review of the Debtors' books and records and other relevant documents and information compiled and communicated to me by the Debtors' consultants and applicable professional advisors.

4. If called as a witness, I could and would testify competently to the matters set forth herein based on the foregoing. I am duly authorized to submit this Declaration on behalf of the Debtors.

5. On the date hereof (the "Petition Date"), each of the Debtors commenced a voluntary case under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"). The Debtors intend to continue in possession of their assets and the management of their business as debtors in possession during the pendency of these chapter 11 cases (collectively, the "Chapter 11 Cases").

6. This Declaration is submitted (i) to provide a brief overview of the Debtors and the Chapter 11 Cases and (ii) in support of the Debtors' chapter 11 petitions and "first day" motions and application (collectively, the "First Day Pleadings"), including, but not limited to, the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Obtain*

*Postpetition Financing, (II) Authorizing Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection to Prepetition Lenders, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "DIP Motion"), which have been filed to minimize any adverse effects to the Debtors as a result of the commencement of the Chapter 11 Cases and to enhance the Debtors' ability to maximize value through the chapter 11 process, including a contemplated sale of substantially all of their assets pursuant to a Court-approved marketing and sale process.

7. This Declaration is organized into the following sections: *Section I* provides a brief overview of the Debtors' business and history; *Section II* summarizes the Debtors' equity ownership and capital structure; *Section III* describes the circumstances that led to the commencement of the Chapter 11 Cases and the Debtors' objective for the Chapter 11 Cases; *Section IV* describes the Debtors' proposed debtor-in-possession financing; and *Section V* affirms and incorporates the facts that support the relief requested in the First Day Pleadings.

**I.    The Debtors' History**

    **a.  The Debtors' Formation and Business**

8. The Debtors were formed in 2017 in connection with the planned repurposing of an existing biofuels refinery (the "Refinery") located in Las Vegas, Nevada that, once complete, will have the capacity to produce 7,500 barrels of renewable diesel per day by converting non-edible renewable and waste feedstocks to premium low-carbon fuels. Such biofuels are one of the most sought-after methods to reduce carbon emissions.

9. The Refinery, once the repurposing is completed, will produce renewable fuels using Topsoe's HydroFlex$^{TM}$ hydro-treating technology, which has been shown to increase yield and lower operating costs. The Refinery's inclusion of a "feedstock agnostic" pre-treatment

plant will enable the Refinery to (x) process fats, greases, and waste agricultural oils and (y) increase business operating flexibility and margins. The production process entails six steps, including: (i) pre-treating the renewable feedstock to remove impurities; (ii) heating and pressuring the clean feedstock; (iii) dissolving hydrogen gas into the liquid feedstock; (iv) pumping the liquid feedstock over a catalyst bed while under high temperature and pressure, resulting in the chemical decomposition of the biomass, which splits into diesel, propane, and water; (v) rearranging (isomerizing) the diesel molecules to improve the cold-flow properties; and (vi) finally, producing renewable diesel with water and renewable propane as the only by-products. This process results in fuel that is 100% renewable and sustainable, is compatible with existing diesel engines, and delivers more efficiency to engines and better mileage than standard diesel due to its high cetane value (80+).[2]

10. Close to 70% of global greenhouse gas emissions are generated by the energy industry with one quarter of that attributable to the transportation sector. The use of renewable diesel is an extremely important component in the decarbonization of the transportation industry over the next ten years, particularly for those parts of the sector that are harder to electrify, including trucks, planes, and ships.

11. Upon completion of the repurposing, the Refinery will be uniquely positioned to capitalize on this need. As of the date hereof, the Refinery is approximately 40%

---

[2] Cetane value is "a measurement of the quality or performance of diesel fuel. The higher the number, the better the fuel burns within the engine of a vehicle . . . . A higher cetane number resulting in quicker ignition of the fuel leads to less non-ignited fuels building up inside the combustion chamber, as well as more complete fuel combustion. Better fuel combustion and quick ignition leads to quicker starting for vehicles, as well as an engine that operates more quietly . . . Moreover, fuel efficiency improves with more complete combustion and harmful emissions are reduced." Energy Education, *Cetane number*, https://energyeducation.ca/encyclopedia/Cetane_number (last visited Feb. 18, 2023). In contrast to the 80+ cetane value for the Refinery's renewable diesel, commercial diesel has a cetane value of 40 to 45.

complete, and the Debtors estimate that it will be operational in approximately eighteen to twenty-four months after the next construction phase commences. The Debtors own the fourteen-acre industrial site in Las Vegas where the Refinery is under construction (the "Site"). The Site is strategically located in Nevada's "Oil Belt"—offering close proximity to alternative sources of feedstocks, fuel storage, and other hydrocarbon infrastructure—and near California— one of the most mature markets for renewable diesel sales. The Site also offers multiple transportation points, including a dedicated rail yard and trucking depot. The Debtors have obtained all necessary permits for the construction of the Refinery and have completed the engineering and design of the Refinery. A projected image of the Refinery is below:



b. **The Construction of the Refinery**

12. To construct the Refinery, on January 23, 2018, Ryze Las Vegas entered into that certain *Engineering, Procurement and Construction Services Contract* (the "EPC Contract") with MMC, Inc. ("MMC"), pursuant to which MMC agreed to provide engineering,

design, drafting, modeling, procurement, construction, and technical support services with respect to the Refinery in exchange for a fixed price of approximately $151 million.

13. Thereafter, on March 12, 2018, Ryze Las Vegas entered into the *Agreement of Purchase and Sale and Joint Escrow Instructions* (as amended, the "Land Purchase Agreement"), pursuant to which NC Industries, LLC ("NC Industries"), an affiliate of MMC, agreed to sell the Site to Ryze Las Vegas. The Land Purchase Agreement recited consideration of $1.7 million in cash and a promissory note in the face amount of $26,581,741.00 (the "Seller Financing Note")[3] to be executed by non-debtor Ryze Renewables Holdings, LLC ("Ryze Holdings")— the parent entity of Ryze Las Vegas—as the obligor on the Seller Financing Note. Title to the Site was conveyed to Ryze Las Vegas, where title remains.

14. In error, as subsequently acknowledged by the parties, the original Seller Financing Note was executed by Ryze Las Vegas, but that error was subsequently corrected by an amendment to the Seller Financing Note, dated May 7, 2021. Pursuant to the amendment, the Seller Financing Note (i) was amended to state that all references to "Borrower" under the Seller Financing Note would be to Ryze Holdings and (ii) was amended *ab initio* to remove Ryze Las Vegas as a party to the Seller Financing Note and to reflect Ryze Holdings as "Borrower" thereunder.[4]

15. As discussed more fully below, on June 25, 2018, Ryze Las Vegas, as borrower, Ryze II, as guarantor, and Georgia's Own Credit Union ("GOCU") entered into that

---

[3] The Seller Financing Note was secured by: (i) substantially all of Ryze Holdings' assets (*e.g.*, its equity interests in non-Debtor Ryze Renewables Nevada, LLC) and (ii) a Guaranty and Pledge Agreement dated March 12, 2018 made by The Ryze Corporation for the benefit of NC Industries on its equity interests in Ryze Holdings.

[4] At no time did NC Industries record or take a mortgage/deed of trust on the Site owned by Ryze Las Vegas, nor did Ryze Las Vegas ever grant a security interest in the Site (or any other property) to NC Industries. Rather, as described below, the Site is subject to a mortgage in favor of the Prepetition Agent in connection with the Prepetition Term Loan Agreement (each as defined below).

certain *Loan Agreement* (as amended, the "Prepetition Term Loan Agreement") to provide financing for the development of the Refinery in the aggregate principal amount of $198 million, 70% of which was guaranteed by the United States Department of Agriculture (the "USDA"). At the time, such USDA guarantees were only available for emerging, commercially unproven technologies, which disqualified Topsoe's HydroFlex$^{TM}$ technology. Accordingly, in June of 2018, MMC began construction to repurpose the Refinery using the "Duke" technology design, which qualified for the USDA guarantee. Despite its novelty, the Duke technology had shown promise and was deployed by DuPont in a number of commercial applications utilizing petroleum feedstocks.

        16.        Approximately seven months after construction of the Refinery commenced, the Debtors became aware of various engineering, mechanical, pollution, and safety issues, among others, at another refinery that used the Duke technology. In response, the Debtors' management team commenced a technology review and assessment to evaluate various alternative technologies that could be utilized to construct the Refinery, which ultimately resulted in the Debtors' decision in October 2019 to utilize Topsoe's HydroFlex$^{TM}$ to complete the Refinery's construction.

        17.        The Refinery's pivot to an alternative technology source resulted in substantial delays and increased costs that vastly exceeded the Debtors' available financing. Whereas the Refinery was initially budgeted to cost approximately $151 million to complete, the Debtors now believe that significant additional funds will be required to complete the Refinery. The Debtors have engaged the appropriate engineering professionals to independently develop a revised cost estimate to complete the Refinery.

**II.     The Debtors' Equity Ownership and Capital Structure**

   **A.     Equity Ownership**

18.     As reflected in the organizational chart attached hereto as <u>Exhibit 1</u>, Debtor Ryze Las Vegas is wholly-owned by Debtor Ryze II.  They are both Delaware limited liability companies.  Ryze II is wholly-owned by non-Debtor Ryze Renewables Nevada, LLC ("<u>Ryze Nevada</u>"), which, in turn, is wholly-owned by non-Debtor Ryze Holdings.  Ryze Holdings is a privately-held company with five shareholders, including (i) Daniel Brown 2018 Family Trust, (ii) RQNMK, LLC, (iii) ADK Advisors, LLC, (iv) Nemo Perrera, and (v) The Ryze Corporation.

   **B.     Capital Structure**

19.     As discussed below, as of the Petition Date, the Debtors have outstanding debt obligations in the aggregate principal amount of approximately $186.4 million, consisting of approximately $180 million in outstanding secured debt under the Prepetition Term Loan Agreement (plus accrued and unpaid interest and fees), a separate advance (the "<u>Advance</u>") by the Prepetition Agent in the amount of approximately $836,000.00 under the Prepetition Funding Agreement (defined below),  and approximately $5.6 million in unsecured debt.

   *i.     The Prepetition Term Loan Agreement*

20.     The Prepetition Term Loan Agreement is a secured term loan facility provided to Ryze Las Vegas by GOCU, as a prepetition lender and as an agent/nominee for the other lending institutions with an interest in the Prepetition Term Loan Facility (as defined below) (in such capacity, the "<u>Prepetition Agent</u>").  The Prepetition Term Loan Facility is partially guaranteed by the USDA in furtherance of its "BioPreferred Program." The BioPreferred Program was designed to increase the use of biobased products, generate jobs, foster economic

development, and "provide new markets for farm commodities."[5]  By promoting the use of biobased products, the USDA endeavors to "reduce[] our nation's reliance on petroleum, increase[] the use of renewable agricultural resources, and contribute[] to reducing adverse environmental and health impacts."[6]

21. The USDA's Rural Development Agency offers loans and grant programs that support the BioPreferred Program, including the Rural Development Business & Industry Loan Guarantee program (the "Loan Guarantee Program").[7]  The significant government-backed guarantees provided pursuant to the Loan Guarantee Program allow lending organizations to coalesce investors, credit unions, and community banks, who benefit from the diminished risk related to the loan.[8]

22. Ryze Las Vegas, as borrower, and Ryze II, as guarantor, entered into the Prepetition Term Loan Agreement with the Prepetition Agent on June 25, 2018 to obtain financing for the development of the Refinery based on the initial estimated cost to complete the Refinery. The Prepetition Term Loan Agreement provided for a term loan in the aggregate principal amount of $198 million (the "Prepetition Term Loan Facility"), to be made available to Ryze Las Vegas in four tranches, including two $69.3 million tranches (*i.e.*, 70% of the principal loan amount) that are each guaranteed by the USDA and two other tranches in the amount of $29.7 million that are not guaranteed by the USDA.  The two $69.3 million USDA-guaranteed tranches were initially

---

[5] United States Department of Agriculture: BioPreferred, https://www.biopreferred.gov/BioPreferred/faces/pages/AboutBioPreferred.xhtml (last visited Feb. 18, 2023).

[6] *Id.*

[7] *Id.*

[8] Jeremy Gilpin, *USDA Loans Can Help Push the United States Energy Independence and Sustainability*, FORBES (June 16, 2022), https://www.forbes.com/sites/forbesfinancecouncil/2022/06/16/usda-loans-can-help-push-us-energy-independence-and-sustainability/?sh=36f737b51fe8.

held by a consortium of credit unions and community banks, but are now predominantly held by the USDA.  The remaining two $29.7 million tranches are each 75% held by Ryze Pass-Through Trust 2018-1 and 25% held by GOCU.

23. With the consent of the Prepetition Agent, the Debtors entered into three amendments (collectively, the "Amendments") to the Prepetition Term Loan Agreement, dated January 13, 2021, May 25, 2021, and October 8, 2021.  Pursuant to the Amendments, interest payments on the Prepetition Term Loan Agreement were deferred from December 2020 to March 2021, and from May 2021 through October 2021.  The Amendments also provided for, among other things, additional reporting requirements.  As of the date hereof, due to an offset taken by the Prepetition Agent against cash held in certain non-Debtor reserve accounts, the total outstanding principal amount under the Prepetition Term Loan Agreement is approximately $180 million, together with all accrued interest and other amounts due thereunder, including the Advance.

24. Additionally, following certain defaults under the Prepetition Term Loan Agreement, including the Debtors' failure to make required payments, the Debtors negotiated three forbearances (each, a "Forbearance Agreement") with the Prepetition Agent.  The Debtors and the Prepetition Agent entered into the first Forbearance Agreement on May 1, 2022, pursuant to which the Prepetition Agent agreed to temporarily forbear from exercising its remedies under the Prepetition Term Loan Agreement until June 30, 2022, and to provide the Debtors with additional time to identify prospective investors to finance the completion of the Refinery.  The first Forbearance Agreement also required each of the Debtors to appoint an independent manager that was reasonably acceptable to the Prepetition Agent.

25. The Debtors entered into an amendment to the first Forbearance Agreement on July 1, 2022, which further extended the forbearance period until July 29, 2022, and subsequently entered into a second Forbearance Agreement on September 20, 2022, which extended the forbearance period until September 30, 2022. Before the Debtors could enter into a third Forbearance Agreement with the Prepetition Agent, NC Industries and the Prepetition Agent each attempted to reconstitute the Debtors' Boards by exercising equity pledges under their respective credit facilities. Litigation ensued and the Debtors' Boards were ultimately reconstituted pursuant to a Nevada state court order. As a result, and as of the date hereof, the Board of Ryze II is comprised of two independent managers and the Board of Ryze Las Vegas is comprised of three independent managers. I remained as the Chief Restructuring Officer of both Debtors during the course of this dispute.

26. Ultimately, a third Forbearance Agreement was entered on December 23, 2022 (the "Third Forbearance Agreement"). Pursuant to the Third Forbearance Agreement, the Forbearance Period (as defined in the Third Forbearance Agreement) expired on December 31, 2022. On February 8, 2023, Ryze Las Vegas, as borrower, and the Prepetition Agent entered into that certain *Funding Agreement* (the "Prepetition Funding Agreement"), pursuant to which the Prepetition Agent agreed to provide additional funding in the amount of $836,000.00 to allow the newly constituted Boards to evaluate strategic alternatives. The advance provided under the Prepetition Funding Agreement is a secured obligation under the Prepetition Term Loan Agreement.

*ii.    Unsecured Debt*

27.     As of the Petition Date, the Debtors' books and records list approximately $5.6 million in unsecured debt to the Prepetition Agent, vendors, taxing authorities, insurers, and other contract counterparties.

### III.    Circumstances Leading to these Chapter 11 Cases; Chapter 11 Objectives

28.     The Debtors have diligently evaluated, in consultation with their applicable professionals and the Prepetition Agent, a number of options to address the financial issues caused by the dramatic increase to the cost of completing the Refinery. These efforts included engaging A&M in August 2022, as well as Guggenheim Securities, LLC ("Guggenheim Securities") in September 2022, to solicit interest from investors or to run a sale process. In connection with that contemplated process, the Debtors, with the assistance of Guggenheim Securities, have spent significant time preparing transaction materials pertaining to the Debtors to assist interested parties in their assessment of the Refinery.

29.     Unfortunately, before the Debtors could launch an out-of-court sale process, the corporate governance litigation referenced above brought the Debtors' sale and financing efforts to a halt. The Debtors also suffered from onerous supplier contracts and a lack of cooperation from certain key contractors. The Debtors were in default under the Prepetition Term Loan Agreement and the Prepetition Agent was hesitant to provide additional financing due to the uncertainties of an out-of-court sale process. Accordingly, the Boards concluded that commencing the Chapter 11 Cases would be in the best interests of the Debtors and their various stakeholders because it would allow the Debtors to maximize value by selling their assets free and clear of claims, shed burdensome executory contracts, and stay all pending litigation.

30. As part of the Chapter 11 Cases, the Debtors intend to initiate a comprehensive, Court-supervised marketing and sale process in accordance with Court-approved bidding procedures and subject to certain agreed-upon milestones in connection with the Debtors' proposed DIP Financing (as defined below). Specifically, the milestones provide that:

- the Debtors will file a motion seeking approval of the bidding procedures by the date that is 7 days after the Petition Date;

- to the extent necessary, the Debtors will hold an auction with respect to the sale of their assets by the date that is 95 days after the Petition Date;

- the Court will enter one or more orders approving the sale of the Debtors' assets by the date that is 100 days after the Petition Date; and

- the Debtors will consummate one or more sale transactions with respect to their assets by the date that is 115 days after the Petition Date.

31. I believe that the Court-supervised sale process will provide the Debtors with the optimal opportunity to obtain the highest or best bid for the Refinery. The Debtors, with the assistance of Guggenheim Securities, will actively engage potential bidders to ensure that the sale process is as broad and competitive as possible, and the Debtors anticipate significant interest, given the Refinery's unique posture and revenue prospects. The Debtors anticipate filing a motion to approve bidding procedures with the Court promptly following the Petition Date, and, subject to Court approval, the Debtors will conduct a value-maximizing marketing and solicitation process in accordance with the bidding procedures. At the conclusion of the sale and marketing process, the Debtors intend to sell all or substantially all of their assets to the purchaser that has submitted the highest or otherwise best offer for the assets.

## IV. The Debtors' DIP Financing Motion[9]

32. To implement the contemplated sale process and preserve asset value during the pendency of the Chapter 11 Cases, the Debtors require an immediate infusion of new liquidity. Accordingly, the Debtors have negotiated and reached agreement on the terms of debtor-in-possession financing (the "DIP Financing") to be provided by GOCU (in such capacity, the "DIP Lender"), consisting of a term loan facility in an aggregate principal amount up to $8 million. The DIP Financing will be secured by a priming, first-priority senior lien on the collateral securing the Prepetition Term Loan Facility, together with all or substantially all other available assets. Subject to Court approval, $2 million of proceeds from the DIP Financing will be made available to the Debtors on an interim basis, *provided, however*, that borrowings made on an interim basis shall be in amounts not less than $250,000 per borrowing. Additionally, in exchange for the Prepetition Agent's consent to the Debtors' use of its cash collateral (the "Cash Collateral"), the Debtors propose to provide an adequate protection package to the Prepetition Agent, consisting of replacement liens, superpriority claims, reporting obligations, and payment of certain advisor fees. The DIP Facility is projected to provide the Debtors with the necessary liquidity to transition smoothly into the Chapter 11 Cases and administer their estates and to implement a comprehensive marketing and sale process for their assets.

33. Prior to the Petition Date, the Debtors, in consultation with their relevant advisors, reviewed and analyzed the Debtors' projected cash needs and prepared the Budget. I believe that the Budget accurately projects the Debtors' funding requirements over the identified period and that such projections are reasonable and appropriate under the circumstances. As the

---

[9] Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the DIP Motion filed contemporaneously herewith.

30181217.1

Budget demonstrates, without the funding provided under the DIP Financing, the Debtors would be unable to administer these Chapter 11 Cases and conduct the contemplated sale process. The Debtors' ability to obtain sufficient liquidity through the DIP Financing and use of Cash Collateral is vital to the preservation and maintenance of the going-concern value of the Debtors' assets and the Debtors' ability to maximize value for the benefit of all stakeholders. Given that the Debtors project that they will generate no operating revenue over the course of these Chapter 11 Cases, absent access to the proceeds of the DIP Financing and the use of Cash Collateral, the Debtors will not have any sources of liquidity to maintain their estates throughout the Chapter 11 Cases.

34. Under the circumstances of the Chapter 11 Cases, including the nature of the Prepetition Term Loan Agreement (and the related USDA guarantees) and the amount outstanding under the Prepetition Term Loan Facility, it would have been highly unlikely, if not impossible, to obtain postpetition financing offers from third parties. Even in the exceedingly unlikely event that the Debtors were able to do so, any proposal for third-party debtor-in-possession financing would have required non-consensual priming liens, which the Prepetition Agent would have likely objected to given the impact such liens would have on the Prepetition Agent's collateral. Thus, the incurrence of such alternative debtor-in-possession financing would have required hotly contested litigation at the outset of these Chapter 11 Cases, which was not a risk that the Debtors, in their business judgment, were willing to take, even assuming that the Debtors received such a financing proposal. Accordingly, the Debtors determined, in their business judgment, that the substantial expense involved in soliciting alternative post-petition financing exceeded any potential savings they might achieve over the proposed DIP Financing.

35. Based on my experience, I believe that the terms of the DIP Financing, including the interest rate and fees, as well as the adequate protection package to be provided to the Prepetition Agent, are reasonable. The Debtors' negotiations with the DIP Lender and the Prepetition Agent were conducted in good faith, at arm's length, and with the assistance of the Debtors' experienced professionals. Additionally, I believe that, absent access to the proceeds of the DIP Financing and use of Cash Collateral, the Debtors would suffer immediate and irreparable harm because the Debtors would have no liquidity and would therefore be unable to run a robust sale process, maintain their business relationships, or pay essential vendors, including engineering and permitting consultants, to the detriment of all stakeholders.

V. **First Day Pleadings**

36. Contemporaneously herewith, the Debtors filed a number of First Day Pleadings, in addition to the DIP Motion described above, seeking orders granting various forms of relief intended to facilitate the efficient administration of the Chapter 11 Cases. The relief sought in the First Day Pleadings is relatively limited because the Refinery is not yet operational and the Debtors do not have any employees.[10] The First Day Pleadings include:

- *Debtors' Motion for Order Authorizing the Joint Administration of Related Chapter 11 Cases*

- *Debtors' Application for Appointment of Stretto, Inc. as Claims and Noticing Agent Effective as of the Petition Date*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing, But Not Directing, Payment of Certain Prepetition Taxes and Fees and (II) Authorizing Financial Institutions to Honor All Related Checks and Electronic Payment Requests*

---

[10] Historically, the Debtors received employee support from their non-Debtor affiliate, Ryze Nevada. As of the date hereof, all employees of Ryze Nevada have been terminated, other than Mr. Matthew Pearson, the founder of the Debtors and their affiliates. Mr. Pearson is not paid by the Debtors. In the months preceding the Petition Date, the Debtors were primarily assisted by support staff from A&M under my supervision.

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing, But Not Directing, the Debtors to Continue Pre-Petition Insurance Policies and Pay All Pre-Petition and Post-Petition Obligations in Respect Thereof and (II) Authorizing the Bank to Honor Related Checks and Electronic Payment Requests*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Continued Maintenance and Use of Pre-Petition Bank Account, (II) Authorizing Continued Use of Existing Business Forms and Payment Methods, and (III) Granting Related Relief*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Financing, (II) Authorizing Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection to Prepetition Lenders, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief*

37. I am familiar with each First Day Pleading, and I believe that the relief sought in each First Day Pleading (i) is necessary to minimize disruption due to the commencement of the Chapter 11 Cases and to permit the Debtors to administer the Chapter 11 Cases smoothly, (ii) constitutes a critical element in the Debtors' achievement of their goals in this chapter 11 process, and (iii) best serves the Debtors' estates and their stakeholders' interests. I have reviewed each First Day Pleading, and the facts and descriptions of the relief set forth therein are true and correct to the best of my information and belief with appropriate reliance on the Debtors' relevant advisors and are incorporated herein in their entirety by reference. If asked to testify as to the facts supporting each of the First Day Pleadings, I would testify as to such facts.

38. It is my belief that the relief sought in each of the First Day Pleadings is necessary to the success of the Debtors' chapter 11 efforts and the maximization of the value of the Debtors' estates through a sale process. It is my further belief that, with respect to those First Day Pleadings requesting the authority to pay specific prepetition claims, the relief requested is

essential to the Debtors' chapter 11 efforts and necessary to avoid immediate and irreparable harm to the Debtors' estates.

39. I hereby certify that the foregoing statements are true and correct to the best of my knowledge, information, and belief, and respectfully request that all of the relief requested in the First Day Pleadings be granted, together with such other and further relief as is just and proper.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is trust and correct to the best of my knowledge and belief.

Executed: March 9, 2023

*/s/ Klaus Gerber*
Klaus Gerber
Chief Restructuring Officer

# EXHIBIT 1

**Corporate Organizational Chart**

30181217.1

Daniel Brown 2018 Family Trust
34,914,557 common units
The Ryze Corporation
(Guaranty of NCI Industries, LLC debt; Pledge of interests in Ryze Renewables Holdings, LLC)
345,731,013 common units
RQNMK, LLC
13,000,000 common units
671,500 preferred units
ADK Advisors, LLC
3,354,430 common units
Nemo Perera
1,000,000 common units
Ryze Renewables Holdings, LLC
(Obligor under Seller Financing Note to NC Industries, LLC; Granted a personal property pledge to NC Industries, LLC to secure its obligations under the Seller Financing Note)
100%
Ryze Renewables Nevada, LLC
100%
Ryze Renewables II, LLC
(Guarantor under Prepetition Term Loan Agreement)
100%
Ryze Renewables Las Vegas, LLC
(Borrower under Prepetition Term Loan Agreement)
Debtor
Non-Debtor

